## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 29 2016, 9:16 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Christopher L. Clerc
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: I.H., A.H., E.H., and F.H., Minor Children,

and

J.H., Mother,

*Appellant-Respondent*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

January 29, 2016

Court of Appeals Case No. 03A01-1507-JT-953

Appeal from the Bartholomew Circuit Court

The Honorable Stephen R. Heimann, Judge

The Honorable Heather M. Mollo, Magistrate

Trial Court Cause Nos.
03C01-1406-JT-2493
03C01-1406-JT-2494
03C01-1406-JT-2495
03C01-1406-JT-2496

**Brown, Judge.**

[1] J.H. ("Mother") appeals the involuntary termination of her parental rights with respect to her daughters, I.H., A.H., E.H., and F.H. (the "Children"). Mother raises one issue, which we revise and restate as whether the evidence is sufficient to support the termination of her parental rights. We affirm.

*Facts and Procedural History*

[2] Mother had four children, I.H., born on October 11, 2000, A.H., born on April 20, 2002, E.H., born on December 30, 2003, and F.H., born on October 26, 2006. In February 2009, the Department of Child Services ("DCS") received reports regarding the condition of the home, that Mother was using illegal drugs, the Children had recurring head lice, and that F.H. had been left unattended and was nearly struck by a car. DCS learned that Mother's grandmother and mother actually had guardianship of the Children at that time. Mother acknowledged to DCS that she was unemployed, did not have stable housing, and had some issues with substance abuse, and that these factors led to the guardianship. DCS closed the assessment because it was determined that the Children had appropriate caregivers under the guardianship.

[3] In March 2012, DCS received a report alleging poor living conditions in Mother's home, trash throughout the home, feces and vomit in the bathrooms, and clothing, other items, and empty beer cases scattered throughout the home. The case was assigned to family case manager Mike Gamroth ("FCM

Gamroth"), and, on March 19, 2012, he knocked on the door of Mother's residence, and a child said that Mother was in the shower. FCM Gamroth returned within twenty minutes, knocked, and contacted law enforcement when no one answered.

[4] Law enforcement and Cathy Franke, the family case manager supervisor, responded to the scene, and Mother answered the door and stated that she had been in the shower. Mother allowed them into the home which was very dirty and had old alcohol bottles, empty beer cases, cleaning chemicals within reach of the children, a stained and sticky carpet, a kitchen cluttered with dirty dishes and pans, and an extremely dirty refrigerator with very little edible food. There was dried vomit around the toilet and used feminine products located in the hallway, and the beds were "covered in items." Transcript at 54. Mother submitted to a drug screen which tested positive for methamphetamine.

[5] On March 20, 2012, DCS filed verified petitions alleging that the Children were in need of services ("CHINS") due to unsafe and unsanitary conditions in the home. The Children were removed due to the conditions of the home and Mother's use of methamphetamine. During the removal of the Children, James Bennett, a person with a drug history, was arrested in front of the Children. Bennett was much younger than Mother and would sometimes be left alone with the Children as a caregiver.

[6] At some point, Home Builders, an intensive family preservation service, helped clean up the home, talked about parenting, and discussed how Mother could

best move forward. On April 28, 2012, the Children were returned to Mother for a trial home visit.

[7] On May 11, 2012, the court held a fact-finding hearing on the CHINS petition and entered an order finding that Mother admitted that the Children were CHINS and finding that Mother was unable or unwilling to maintain a safe environment for the Children. A dispositional hearing was held on June 14, 2012.

[8] On June 26, 2012, Ann Moore, a home-based case worker, met with Mother. That day, Mother had moved into "grandma's home," but they had lost that home "just immediately" because grandmother died. *Id.* at 58. Mother told Moore that they were going to camp in the woods for a couple weeks until she could "figure things out." *Id.* at 59. During the visit, A.H. had stepped on a piece of glass and had "a little pseudo band-aid tied around it." *Id.* at 58. A.H. was waiting for someone to come and take her to the emergency room, but no one came for almost an hour, so Moore took her to the emergency room where she received stitches. The next day, Mother tested positive for methamphetamine, the trial home visit was terminated, and the Children were removed from Mother's care due to ongoing concerns of housing and a lack of medical attention.

[9] On July 2, 2012, the court entered a dispositional order which ordered Mother to contact the family case manager every week to allow them to monitor compliance, complete the 12 Step Facilitation program through Centerstone,

complete a psychological evaluation and successfully complete any and all recommendations, attend and participate in NA/AA meetings, continue to meet with a recovery coach, successfully complete home-based case management and/or therapy, and successfully complete an intensive family preservation program.

[10] At some point, Mother was diagnosed with a major and recurrent depressive disorder. In November 2012, she completed the twelve-step facilitation and aftercare through Centerstone as recommended by her substance abuse evaluation, but subsequently missed appointments with her recovery coach.

[11] In January 2013, Mother tested positive for methamphetamine and underwent a medication evaluation. It was recommended that she take medication, and she sometimes complied.

[12] In April and May 2013, Mother again tested positive for methamphetamine and missed a couple of psychiatric medication appointments. In June 2013, inpatient treatment was recommended.

[13] In July 2013, Mother went to Harbor Lights and was released with recommendations to follow up with Centerstone, undergo another assessment, and follow those recommendations. The next month she began "Living in Balance," but by September 2013 it was reported that she was behind in her meetings. *Id.* at 146. She graduated from "Living in Balance" on October 30,

2013, but it was noted that she had three missed appointments during the month of October. *Id.*

[14] In January 2014, the plan was for Mother to seek individual counseling and medication management services through Centerstone on her own, and it "would have been a fairly easy transition for her" because she was still working with Centerstone. *Id.* at 118. On February 4, 2014, Beth Grunewalt was assigned as Mother's individual therapist, but reported no contact after Gruenwalt made multiple attempts. On February 20, 2014, Mother was reassigned to Ashley Pulskamp, another therapist employed at Centerstone. The next month she began individual therapy with Pulskamp, but following the March 21st session Pulskamp did not see or hear from Mother for two months, and Mother failed to show for two drug screens.[1] On May 21, 2014, Pulskamp reviewed the zero tolerance agreement with Mother which detailed that she could not miss three more appointments without a doctor's statement and that she could not fail drug screens, and she signed the agreement. Mother kept her next two appointments, including one on June 12, 2014, at which she said that she was barely able to make it to work that day and that she was thinking about using. Meanwhile, after May 16, 2014, medication management could no longer contact Mother because she "never followed up." *Id.* at 120.

---

[1] When asked whether Mother had any positive drug screens during 2014, Elizabeth Curtis, a family case manager, testified that she had "what we would consider positive no shows," one of which occurred in March and another in April. Transcript at 113.

[15]     On June 6, 2014, DCS filed a verified petition for the involuntary termination of Mother's parental rights to the Children[2] and a hearing was held on November 18, 2014. Moore, the home-based case worker, described the supervised visitation as "[u]sually very chaotic" with "[e]verybody talking at once." *Id.* at 59. When asked if she noticed any changes over the course of the last two and one-half years, Moore stated: "Overall we are pretty much at the same place." *Id.* at 60. Moore testified that she tried to give Mother some direction on how to improve visits with the Children, which were chaotic, but Mother did not implement the direction on a consistent basis.

[16]     When asked to explain her concerns with Mother's housing stability, Moore stated that Mother had been evicted from her initial residence, lost her grandmother's home to an eviction, stayed with some friends for a couple of weeks, moved back to grandmother's home until the foreclosure in April 2013, then slept on her friend's couch in April and May, moved to a home in Columbus until the fall of 2013 when she moved into a home on Stanley Drive, but lost that home in December 2013 because her dog did substantial damage to the home and she was asked to leave, moved into a rental home in Columbus and stayed there until July 2014, and then moved to a mobile home park with a friend in Elizabethtown. Moore also testified that Mother had lost multiple jobs.

---

[2] DCS also requested the termination of the parental rights of the Children's father. The father signed consent forms regarding the termination.

[17] When asked her opinion as to Mother's ability to provide and care for the Children long term, she answered: "Well, with the lack of employment stability and the lack of housing stability, I would say long term prognosis would not be good." *Id.* Moore testified that the Children love Mother but are tired and "they just need this chapter to close so that they can move on." *Id.* at 68-69. She testified that Mother "really tried hard" but "was just unable to show the ability to provide stability." *Id.* at 69.

[18] Pulskamp, Mother's therapist, testified regarding Mother's missed appointments and that she had no contact with Mother since June 12, 2014, stating "[s]he was scheduled to follow up with me on June 16th, 2014 for her next appointment, and no call no showed." *Id.* at 81.

[19] The court appointed special advocate, Kelly Harden ("CASA Harden"), testified that she had concerns with Mother's inconsistent housing, financial instability, lack of transportation, and inability to obtain utilities such as heat. She expressed concern for the Children's need for permanency. She testified that she did not believe that Mother was able to provide the Children with a safe, drug free, stable home and that she did not foresee Mother being able to obtain that in the near future. When asked what she believed was in the best interest of the Children, she stated "at this time for permanency for the [C]hildren, it would be for them to move forward with the adoption and to terminate rights." *Id.* at 94.

[20] A family case manager, Elizabeth Curtis ("FCM Curtis"), testified that during the life of the case, Mother has had "[f]ive homes with two, at least two periods of unknown whereabouts and at one point staying with, several instances of staying with friends while looking for a home." *Id.* at 142. She did not consider Mother to have successfully completed counseling, and testified that Mother was compliant with home-based case management but goals were not met, issues were not resolved, and she did not develop new coping skills. She testified that Mother can maintain sobriety but that "it's concerning that we are seeing a relapse, a pattern of relapses." *Id.* at 130. She testified that Mother was not compliant with meeting either her or the Children's medical and mental health needs, and that she was concerned with "[h]ousing, employment, organization, budgeting, transportation[,] [p]arenting, decision making." *Id.* at 122.

[21] When asked whether she had the opportunity to view Mother's current address in Elizabethtown, FCM Curtis answered:

> I have not. I have been out there two times and have not been successful in making contact with anyone living in the home. It's reported that [Mother] is staying with either roommates or friends and I'm not aware of who those people are.

*Id.*

[22] Mother testified that she lived in a trailer with Bennett's mother, father and grandmother, but they were moving out of the trailer, and her mother was moving in with her. She testified that Bennett "kinda floats between, back and

forth." *Id.* at 166. She stated that FCM Curtis did not leave her business card at her most recent residence or tried to call, that she worked forty hours a week at Wal-Mart and part-time at another employer, that she attends NA meetings, has a sponsor, has been clean since she had been at Harbor Lights, and that a lot of her problems were due to her financial situation. On cross-examination, she testified that she still associates with Bennett because he went "through all this with me and he is one of the people that sit down and encourage me, and talk to me and tell me to keep my head up, and tell me that I'm, to keep on trying, and not to give up." *Id.* at 176-177.

[23] On May 8, 2015, the court entered an order terminating Mother's parental rights, making detailed findings of fact, and concluding that there is a reasonable probability that the conditions which resulted in the Children's removal and continued placement outside the home will not be remedied, that continuation of the parent-child relationship poses a threat to the Children's well-being, that termination of Mother's parental rights was in the Children's best interests, and that adoption is a satisfactory plan for the Children.

## *Discussion*

[24] The issue is whether the evidence is sufficient to support the termination of Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[25] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.* This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.*

[26] "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional

harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967), *reh'g denied*). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A)). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[27] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[28] In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a

parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id.*

[29] A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014), *trans. denied*.

[30] Mother argues that DCS did not present clear and convincing evidence that there is a reasonable probability that the conditions which resulted in the

Children's removal or the reasons for placement outside the home would not be remedied. She asserts that she had adequate housing, employment, and was sober at the time of the termination hearing.

[31] DCS argues that Mother does not challenge any of the court's findings and that the findings support the termination order. DCS points out that Mother does not challenge the court's conclusion that termination was in the Children's best interests or that DCS had a satisfactory plan for the Children.

[32] The trial court's order addressed the arguments Mother now raises on appeal regarding her housing, employment, and sobriety. Specifically, the court found:

> 17. There have been no positive drug screens since Mother's release from Harbor Lights in July 2013. The DCS family case manager has had difficulty contacting Mother for purposes of administering drug screens. She has gone to Mother's home and has sent texts in an attempt to drug screen, with no response. The last screen that was administered was June 2014.
>
> * * * * *
>
> 22. Mother has lived in nine different locations since June 2012. No home has been appropriate for the Children to live in. She has been evicted from one home and asked to vacate another after leaving a dog unattended in the home while she stayed with the family of a boyfriend. At one point she was sleeping on a friend's couch. One of the homes had no running water. Another home had the electricity disconnected due to lack of payment. At time of trial, Mother testified that [] she has secured a three bedroom trailer. There currently are other occupants in the trailer that Mother reports will be moving out. These occupants are the family to James Bennett, an individual Mother

has been cautioned about. She is still involved with Mr. Bennett romantically. The family members of Mr. Bennett will be moving into a trailer in close proximity to Mother and she plans to rely on the family to help with transportation and the care of the Children. These plans strongly indicate that Mr. Bennett will continue to have a presence in the lives of the Children.

* * * * *

24. Mother's lack of stability with employment also has contributed to an ongoing state of crisis. She has held seventeen jobs since June 2012, some lasting only one day. At time of trial, Mother was employed at Wal-Mart and Clarion.

Appellant's Appendix at 48-49. The court also found that Mother's attendance in recovery work and individual therapy has been "sporadic to non-existent." *Id.* at 47. The court also found:

40. Even if Mother has now demonstrated a sufficient period of time with sobriety, she is still not in a position for the Children to be immediately returned to her care. Daily living stability, improved mental health functioning and the ability to parent four Children would require additional services and monitoring. The Children's urgent needs for permanency do not support giving Mother this additional time.

*Id.* at 51.

[33] The record reveals that the Children were removed from Mother in March 2012 due to the unsafe and unsanitary conditions in the home and Mother's use of methamphetamine. While Mother made some progress at certain times, she tested positive for methamphetamine multiple times after the removal of the

Children, failed to show for drug screens in March and April 2014, did not comply with the recommendations following her release from Harbor Lights, did not keep appointments with her therapists, did not follow up with medication management, did not develop new coping skills, and switched jobs and moved multiple times. Mother failed to demonstrate during visits that she could successfully deal with the Children. FCM Curtis testified that the conditions which resulted in the removal of the Children had not been remedied. CASA Harden testified that she did not believe that Mother was able to provide the Children with a safe, drug free, stable home, and that she did not foresee Mother being able to obtain that in the near future.

[34] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there was a reasonable probability that the conditions leading to the Children's removal would not be remedied. As pointed out by DCS, Mother does not challenge the trial court's finding that termination was in the Children's best interests.

## *Conclusion*

[35] We conclude that the trial court's judgment terminating Mother's parental rights is supported by clear and convincing evidence. We find no error and affirm.

[36] Affirmed.

Kirsch, J., and Mathias, J., concur.